# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
April 18, 2013 Session

## MAIN STREET MARKET, LLC, ET AL. v. EMILY V. WEINBERG

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-00-0844-1/98-0918-1      Walter L. Evans, Chancellor**

---

**No. W2012-01774-COA-R3-CV - Filed July 31, 2013**

---

This dispute arises from a fire that destroyed six adjoining buildings in 1997. The buildings were located along a single city block, running north to south, in downtown Memphis, Tennessee. Defendant owned the second building, sandwiched between one building to the north, owned by one of the Plaintiffs, and the four remaining buildings to the south, owned by the other Plaintiff. Approximately one month before the fire, a substantial portion of the second and third buildings collapsed, damaging all six buildings, and compromising the structural integrity of each building. Due to safety concerns, the parties were ordered not to enter the buildings and were required to ensure that their buildings were inaccessible to the public. The parties complied with the orders. Shortly thereafter, a trespasser entered the Defendant's building and started a fire which spread to each of the adjoining buildings resulting in substantial damage. Plaintiffs filed negligence actions against the Defendant and argued that she was liable to them for their property damage caused by the criminal acts of the trespasser. Following a trial, the trial court entered a directed verdict in favor of the Defendant based on its conclusion that the Plaintiffs failed to establish any of the requisite elements of their negligence claims. After throughly reviewing the record, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

William L. Hendricks, Jr., Memphis, Tennessee, for the appellants, Gilbert Lawrence Callaway and Rebecca Duncan Callaway.

Stephen R. Leffler, Memphis, Tennessee, for the appellant, Main Street Market, LLC.

William M. Jeter and Meredith A. Lucas, Memphis, Tennessee, for the appellee, Emily V. Weinberg.

**OPINION**

**I. Background and Procedural History**

In 1997, a fire destroyed six adjoining buildings located at 100, 102, 104, 106, 108, and 110 South Main Street in downtown Memphis, Tennessee. Emily V. Weinberg ("Defendant" or "Weinberg")[1] owned the building located at 102 South Main Street. Gilbert and Rebecca Callaway (the "Callaways") owned the building located at 100 South Main Street, and Main Street Market, LLC ("MSM") (collectively with the Callaways as the "adjoining owners") owned the remaining four buildings located at 104 to 110 South Main Street.

On October 3, 1997, approximately one month before the fire occurred, a substantial portion of the buildings located at 102 and 104 South Main Street collapsed. Following the collapse, the Memphis Fire Department ("MFD") became involved in the inspection of the buildings, management of the scene, and the plan to remedy or demolish the properties. On October 8, 1997, the Memphis and Shelby County Office of Construction Code Enforcement posted a "Do Not Occupy" sign on the buildings, forbidding any entrance to the buildings without permission of the MFD. Due to safety concerns, the MFD required the parties to ensure that their buildings were inaccessible to the public until such time that the buildings could be demolished or repaired. As such, on or before October 9, 1997, Weinberg hired a construction company to erect a temporary fence to deter entrance into her building. As described in the record, the temporary fence was the type customarily used to secure a construction site, and consisted of a chain-link fence secured to the ground by lag bolts fastened through a plate at the base of the fence posts.

On October 14, 1997, the MFD notified Weinberg that portions of her building were continuing to collapse over time, and that the fence in front of her building was knocked down. A few days later, on October 17, 1997, the MFD notified Weinberg that trespassers were discovered entering the front of her building. In response, Weinberg hired the same construction company to make repairs to the fence to prevent future trespassers from entering her building. On October 21, 1997, the parties met with the MFD to discuss the ongoing plan to repair or demolish the buildings, but no concerns were raised regarding the fence used to secure Weinberg's building. On October 27, 1997, the MFD notified Weinberg that seven

_____

[1]During the proceedings below, Mrs. Weinberg died, and her son and executor, Van Weinberg, was substituted as the named Defendant in the case.

teenagers were arrested for breaking into her building by bypassing the fence and prying open the pull-down, metal bars that secured the doors and windows across the front of the building. Again, Weinberg hired the construction company to make the necessary repairs to the fence to prevent future trespassers from accessing her building. On November 7, 1997, the MFD issued a notice to Weinberg ordering her to repair or remedy the dilapidated condition of her property caused by the collapse.[2]  Thereafter, on November 9, 1997, a trespasser entered Weinberg's building and started a fire which spread to each of the adjoining buildings on South Main Street. As a result, each of the six buildings suffered substantial damage from the fire and the water used in attempting to extinguish the fire.

The adjoining owners filed separate negligence actions against Weinberg for damages arising out of the fire. On November 3, 2000, the trial court entered an order consolidating the two cases. Subsequently, in February 2012, a bench trial was conducted in this matter. At the conclusion of the adjoining owners' proof, Weinberg made a motion for directed verdict which the trial court took under advisement and proceeded to hear Weinberg's proof. Following the trial, on May 11, 2012, the trial court issued its Findings of Fact and Conclusions of Law which provides, in pertinent part, as follows:

> 6. For reasons undetermined, on October 3, 1997 the middle sections and the party wall of 102 and 104 South Main collapsed. The collapse was progressive in that proportions of the buildings continued to fall after the initial collapse.
>
> 7. Plaintiffs offered no proof to support any findings of fault or liability against the Defendant for the collapse, and this Court granted the Defendant's motion for a directed verdict as to any damages from the collapse.
>
> . . . .
>
> 18. On November 9, 1997, all the buildings caught fire and sustained some fire and/or water damage. Plaintiffs alleged that Defendant's negligent failure to prevent a trespasser from entering 102 South Main Street was the cause of the fire. Plaintiffs also claimed that they suffered property damages to their adjoining buildings as a result of this fire, which spreaded [sic] from 102 South Main Street.

---

[2]Tennessee Code Annotated section 68-102-117 authorizes certain officers to order that specific dangerous building conditions be remedied.  If the owner of the building does not comply with the order and the condition is not remedied, then Tennessee Code Annotated section 68-102-121 authorizes the officer to repair or demolish the building.

19. The facts of the November 9, 1997 fire, however, are not well established by the proof. Plaintiffs only evidence concerning proof of the arson was the grand jury indictments against a McArthur Bobo for arson and burglary of 102 South Main Street.

20. The plea agreements provide no detailed information concerning how the crime was committed or how any of the Plaintiffs buildings were affected or involved by Mr. Bobo's actions. Similarly, the indictments merely recite the language of the criminal statutes in stating that burglary and arson acts were committed on the property of Marty's Clothing. [102 South Main Street][.]

21. No evidence was submitted to the Court establishing where or how the arsonist entered 102 South Main. There was no proof that breaching the front fence was his point of entry. There was also no proof of any details of his crime such as how the fire started or how the fire spreaded [sic] to the other buildings.

22. The Court finds that the Plaintiffs failed to provide the Court with sufficient facts to make a determination as to the extent and cause and extent of any collateral damage to the subject buildings from the fire as opposed to the previous damage that may have been sustained from the collapse, which had occurred on October 3, 1997, approximately one month before the fire.

23. There was an abundance of evidence suggesting that all of the buildings had been damaged to some degree by the October 3rd collapse. The Plaintiffs' own expert in the field of structural engineering, Robert McCaskill, testified that the buildings at 102, 104 and 106 South Main were not salvageable after the collapse. Mr. McCaskill testified that at the time of his inspection, which was sometime after the collapse of October 3, 1997 and before the fire of November 9, 1997, the Callaways' building at 100 South Main was not in good condition, but it was salvageable. He testified that after the collapse, 100 South Main was not safe to enter because the north and south walls were leaning. Mr. McCaskill prepared drawings of a plan for stabilizing 100 South Main to prevent further damage from the collapse. There was never any question that 102 and 104 South Main had to be demolished. As to 106 South Main, Mr. McCaskill testified that it was too far gone to save. He also explained that 108 South Main should be monitored closely and recommended that it be supported by shear walls. Mr. McCaskill determined that 110 South Main was salvageable.

-4-

24. The testimony of Mr. McCaskill clearly established that the buildings were not in the same condition, as they had been prior to the collapse. The proof showed that the value of the properties had been diminished to some degree by the collapse.

25. The facts of this case are undisputed that neither the Defendant, Mrs. Weinberg, nor any of her agents started or caused any fire or collapse damage to Plaintiffs' buildings.

26. The gist of Plaintiffs' claim is that the Defendant Weinberg is liable in tort to them for damage to their buildings due to negligence and the act of an arsonist who allegedly gained access to Defendant's 102 South Main location through a poorly constructed fence barrier at the front of said building.

. . . .

29. This Court finds that the Plaintiffs have failed to establish any of the requisite elements of negligence by the Defendant to sustain any award for damages.

30. More specifically, this Court finds that the Defendant, Mrs. Weinberg owed no duty, which she may have breached, to protect Plaintiffs' property from the criminal acts of a third party.

31. This Court is not aware of any Tennessee case on point which identifies any duty a property owner owes to his neighbors regarding damage caused by a third party trespasser's intentional acts.

32. When the existence of a particular duty is not given, courts will turn to public policy and established precedent for guidance. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 366 (Tenn. 2008).

33. The Court determines whether a duty exists by evaluating the risk involved. *Biscan v. Brown*, 160 S.W.3d 347, 366 (Tenn. 2008). Generally a person has a duty to act reasonably if their conduct presents a foreseeable and grave harm to another that outweighs the burden of engaging in alternative conduct. *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). However, there is no affirmative duty to act for the protection of another "unless the defendant 'stands in some special relationship to either the person who is the source of the danger, or to the person who is foreseeably at risk from the danger.'"

*Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 871 (Tenn. 1993)); *see also* Restatement (Second) of Torts § 315 (1965). This is commonly known as the "no duty to act or rescue" rule.

34.  Tennessee courts have continued to preserve the no duty to act or rescue rule, unless the Court finds the existence of some special relationship between the parties. . . .

35.  Under the law, Mrs. Weinberg had no duty to protect her neighbors' property from criminal acts committed by a third party. Tennessee has never held that landowners have a special relationship with their neighbors sufficient to create a duty to act or rescue. This state, and this entire country, strongly values the individual rights of property owners to be independent and free from interference in the possession of their property, and that public policy would be undermined by imposing a duty between neighboring property owners to protect each other from third party criminal acts.

36.  In *McClung v. Delta Square Ltd. P'ship.*, 937 S.W.2d 891, 902 (Tenn. 1996), the Tennessee Supreme Court did address the duty owed by commercial businesses to protect their customers from known third party criminal acts.

37.  The Tennessee Supreme Court has also imposed a duty upon landlords and innkeepers to protect their tenants from third party criminal acts of which they have notice. *Tedder v. Raskin*, 728 S.W.2d 343 (Tenn. Ct. App. 1987).

38.  Nonetheless, the duty analysis in those cases is not applicable to this case because the basis of that legally imposed duty hinges on a special relationship between a commercial business and its customers or a landlord and its tenant. There is no such relationship in this case. The Defendant was merely an owner of property, and there is no such special relationship between neighbors. This Court is not aware of any precedent in this state holding that neighbors have a special relationship sufficient to overcome the general common law no duty to act or rescue rule.

39.  This Court finds that neighbors do not have an affirmative duty to protect each other's property from third party criminal acts, therefore Mrs. Weinberg had no duty to protect the Plaintiffs' buildings from arson. Such a cumbersome duty would be against public policy because the burden outweighs any foreseeable risk.

40. Owning property adjacent to neighbors does not trigger a relationship sufficient to require the onerous duty of preventing third party criminal acts.

41. Since the Defendant had no affirmative duty to act, she cannot be found negligent for any fire damage to an adjoining owner's property.

Thereafter, on July 27, 2012, the trial court entered its final order granting Weinberg's motion for directed verdict. The adjoining owners timely filed a notice of appeal to this Court.

## II. Issue Presented and Standard of Review

On appeal, the adjoining owners argue that the trial court committed reversible error in its application of the law to the facts of this case when it granted Weinberg's motion for directed verdict after all of the evidence was presented. Weinberg's motion for directed verdict, however, was an improper motion because "motions for directed verdicts have no place in bench trials." *Boyer v. Heimermann*, 238 S.W.3d 249, 254 (Tenn. Ct. App. 2007) (footnote omitted). Instead, "[t]he proper motion would have been a motion for an involuntary dismissal at the conclusion of the plaintiff's proof in accordance with Tenn. R. Civ. P. 41.02." *Id*.[3] Therefore, we will construe the trial court's order as if it were an order granting a motion for involuntary dismissal under Rule 41.02(2). *Id.* (footnote omitted).

In *Via v. Oehlert*, 347 S.W.3d 224 (Tenn. Ct. App. 2010), we explained the standard of review applicable in this case:

When a motion for involuntary dismissal is made at the conclusion of the plaintiff's proof in a bench trial, "the trial court must impartially weigh the

---

[3]Rule 41.02(2) of the Tennessee Rules of Civil Procedure provides:

After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiffs evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court grants the motion for involuntary dismissal, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment.

Tenn. R. Civ. P. 41.02(2).

evidence as though it were making findings of fact and conclusions of law after all the evidence has been presented." *Building Materials Corp. v. Britt*, 211 S.W.3d 706, 711 (Tenn. 2007); *Thompson v. Hensley*, 136 S.W.3d [925,] at 929 [(Tenn. Ct. App. 2003)]; *see also Burton v. Warren Farmers Coop.*, 129 S.W.3d [513,] at 520 [(Tenn. Ct. App. 2002)]. If a plaintiff has failed to demonstrate her right to relief by a preponderance of the evidence under the facts as found by the court and pursuant to the applicable law, then the case should be dismissed. *Building Materials Corp. v. Britt*, 211 S.W.3d at 711; *Burton v. Warren Farmers Coop.*, 129 S.W.3d at 520–21.

> The standard of review of a trial court's decision to grant a Rule 41.02 involuntary dismissal is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Building Materials Corp. v. Britt*, 211 S.W.3d at 711. This standard is appropriate because the trial court has used the same reasoning to dispose of the motion that it would have used to make a final decision at the close of all the evidence. *Burton v. Warren Farmers Coop.*, 129 S.W.3d at 521. Thus, we must review the record on appeal *de novo* with a presumption that the trial court's factual findings are correct. We will affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case. We will also give great weight to the trial court's assessment of the evidence because the trial court is in a much better position to evaluate the credibility of the witnesses. *Burton v. Warren Farmers Coop.*, 129 S.W.3d at 521.

*Boyer v. Heimermann*, 238 S.W.3d 249, 254–55 (Tenn. Ct. App. 2007).

*Id.* at 228-29.

### III.  Discussion

In order to prevail on a negligence claim, a plaintiff must establish the following essential elements:  "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn.

1995)).  The first element, that of duty, is the dispositive issue in this matter.[4]  "Duty is a legal obligation to conform to a reasonable person standard of care in order to protect others against unreasonable risks of harm." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) (citing *Burroughs v. Magee*, 118 S.W.3d 323, 328-29 (Tenn. 2003); *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).  As with any negligence case, the inquiry is whether the particular defendant owes a duty of care to the particular plaintiff involved in the case at bar.  *Nichols v. Atnip*, 844 S.W.2d 655, 662 (Tenn. Ct. App. 1992). Whether a defendant owes a duty of care to a plaintiff is a question of law to be determined by the court.  *West v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 550 (Tenn. 2005) (citing *Burroughs*, 118 S.W.3d at 327; *Staples*, 15 S.W.3d at 89; *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998)).

In this case, we must determine whether Weinberg had a duty to protect the adjoining owners from the criminal act of a trespasser that occurred on her property.  As the Tennessee Supreme Court explained in *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359 (Tenn. 2009):

> In general, an individual has a duty to others to refrain from engaging in misfeasance, affirmative acts that a reasonable person "should recognize as involving an unreasonable risk of causing an invasion of an interest of another" or acts "which involve[ ] an unreasonable risk of harm to another." Restatement (Second) of Torts §§ 284, 302 (1965). Under our common law, however, courts were reluctant to impose liability for nonfeasance, a course of inaction, as opposed to an act risking harm to others. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56, at 373 (5th ed.1984). As a means of mitigating the harshness of the common law rule, exceptions have been created for circumstances in which the defendant has a special relationship with either the individual who is the source of the danger or the person who is at risk. *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 860 (Tenn. 1985).

*Id.* at 364.  Tennessee court's "have previously recognized such special relationships to include those of innkeeper and guest, common carrier and passenger, possessors of land and guests, social host and guest, and those who have custody over another."  *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819-20 (Tenn. 2008) (citing *Bradshaw v. Daniel*, 854 S.W.2d 865, 872 (Tenn. 1993); *McClung v. Delta Square Ltd. P'ship.*, 937 S.W.2d 891, 895 (Tenn. 1996); *Lindsey*, 689 S.W.2d at 860; Restatement (Second) of Torts § 314A). This list,

---

[4]For the first time on appeal, the Callaways raise an argument based on a negligence per se theory. It is well established, however, that issues not raised at trial will not be considered for the first time on appeal.  *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).  Therefore, we decline to address this issue.

however, is not exhaustive.

Instead, when determining whether a special relationship exists so as to create an affirmative duty to act for the protection of a third party, "we will weigh public policy considerations" and "also consider whether the plaintiff's injuries and the manner in which they occurred were reasonably foreseeable." *Biscan v. Brown*, 160 S.W.3d 462, 479 (Tenn. 2005) (citing *Burroughs*, 118 S.W.3d at 329; *Bain v. Wells*, 936 S.W.2d 618, 625 (Tenn. 1997); *Bradshaw*, 854 S.W.2d at 870).

> This emphasis on foreseeability in third-party cases dovetails with the balancing test we generally apply in considering whether a defendant owed a duty of care to a particular plaintiff. Specifically, we consider
>
>> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.
>
> The balancing test attempts to align the imposition of a duty with "society's contemporary policies and social requirements concerning the right of individuals and the general public to be protected from another's act or conduct." Although all the balancing considerations are important, the foreseeability prong is paramount because "[f]oreseeability is the test of negligence."

*Biscan*, 160 S.W.3d at 479-80 (internal citations omitted).

The trial court concluded that owning adjacent properties does not trigger a special relationship sufficient to require the onerous duty of protecting your neighbor from the criminal acts of a third party.[5] The question of whether a special relationship exists such that

---

[5]On appeal, the adjoining owners do not allege that a special relationship existed. Instead, they argue that longstanding precedent recognizes the duty of a property owner to use reasonable care to avoid negligent damage to an adjoining property owner. In support of this position, the adjoining owners cite *XI Props. v. RaceTrac Petroleum, Inc.*, 151 S.W.3d 443 (Tenn. 2004) and *Northcross v. Loew's Memphis Theater Co.*, 3 Tenn. App. 51 (Tenn. Ct. App. 1925). These cases, however, fail to address the issue presented to the Court. *See XI Props.*, 151 S.W.3d at 443 (holding that "landowners had no duty to maintain [a] sloped
(continued...)

Weinberg had a duty to protect the adjoining owners from the criminal act of a trespasser that occurred on her property involves the threshold inquiry into the foreseeability of the risk to which the adjoining owners were exposed, i.e., whether it was "a reasonably foreseeable probability, not just a remote possibility, and that some action within the defendant's power more probably than not would have prevented the injury." *Doe v. Linder Const. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992).

> However, because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome might be conceivable is not sufficient to give rise to a duty. For the purpose of determining whether a duty exists, the courts' consideration of foreseeability is limited to assessing whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it. In this context, the courts are not concerned with the ultimate reasonableness, or lack of reasonableness, of the defendant's conduct. Rather, the courts are simply ascertaining "whether [the] defendant was obligated to be vigilant of a certain sort of harm to the plaintiff."

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 367 (Tenn. 2008) (footnotes omitted). Moreover, when analyzing the foreseeability of the harm suffered by the plaintiff, "[c]ourts may consider, 'among other things, the presence or absence of prior similar incidents.'" *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 533 (Tenn. Ct. App. 2011) (quoting *Giggers*, 277 S.W.3d at 365 (citing *McClung*, 937 S.W.2d at 901)).

The adjoining owners argue that Weinberg reasonably knew or should have known of the probability of a trespasser intentionally setting fire to her building because she was notified on more than one occasion either that her fence had been knocked down, or that trespassers were discovered entering her building. Further, the adjoining owners point to the notice issued to Weinberg by the MFD ordering her to remedy or repair her building. In light of these occurrences, the adjoining owners argue that it was foreseeable that their buildings would be damaged from the spread of the fire, and thus Weinberg was duty bound to protect them from arson committed by the trespasser.

---

[5](...continued)
embankment that provided support to sides of parking lot on adjoining land, but were subject to a duty of reasonable care to avoid unnecessary and foreseeable damage to the adjoining land" when removing the sloped embankment); *Northcross*, 3 Tenn. App. at 59 (in a case involving allegations of negligent demolition of a building, this Court explained that "a duty is imposed upon the owner of a building to exercise reasonable care and diligence so that the building will not collapse and cause injury to adjoining owners.").

Based on the record and arguments before us, we conclude that it was not reasonably foreseeable that the adjoining owners' buildings would be destroyed by a fire which was intentionally set by a trespasser in Weinberg's building. Due to the unsafe conditions of the parties' buildings after the collapse, Weinberg had even less control over her property than would a typical building owner under normal circumstances. Although Weinberg was notified on one occasion that her fence had been knocked down, and twice that trespassers were discovered entering her building, each time she promptly responded and ensured that the fence was repaired in order to secure her building and prevent future access. In fact, the record shows that, before the date of the fire, Weinberg repaired her fence to prevent trespassers from entering her building. Regarding the notice issued to Weinberg by the MFD, the date of violation provided on the notice was "October 3, 1997 and continuing." Thus, it is clear that the notice pertained to the date of the collapse and the ongoing obligation of the parties to either repair or demolish their dilapidated properties. Notably, the record also indicates that the MFD issued MSM a similar notice ordering them to repair or remedy its building. According to Weinberg, the MFD issued these notices to the parties in order to expedite the process of receiving insurance money to pay for the demolition of their buildings.

The adjoining owners and the MFD never raised any concerns about the adequacy of Weinberg's fence before the date of the fire. Also, the adjoining owners and the MFD never requested any action on Weinberg's behalf beyond repairing the fence whenever it was knocked down. Except for the two instances of trespassing, the record does not contain any evidence of prior criminal acts occurring on or anywhere near Weinberg's property. Generally speaking, trespass does not pose a danger to those outside of the premises. Moreover, we are unable to find any evidence in the record which would have suggested to Weinberg that she needed to affirmatively act in order to protect the adjoining owners from arson. Also absent from the record is any evidence to show that any action by Weinberg would have deterred the arsonist given the dilapidated conditions of the parties' buildings. It is an easy thing to say after the fact that more preventative measures should have been in place at a certain time, but a property owner is not charged with a duty to be clairvoyant. *See Corbitt v. Ringley-Crockett, Inc.*, 496 S.W.2d 914, 919 (Tenn. Ct. App. 1973) (citing *Ward v. University of South*, 354 S.W.2d 246 (Tenn. 1962)).

Even assuming for the sake of argument that the harm to the adjoining owners was somewhat foreseeable, "that showing is not, in and of itself, sufficient to create a duty. Instead, if a risk is foreseeable, courts then undertake the balancing analysis." *Satterfield*, 266 S.W.3d at 366. Public policy considerations certainly outweigh the slight foreseeability of the harm to the adjoining owners. The duty to protect another from the criminal acts of a third party is one traditionally imposed on our government, not the owners of private property. Adjoining property owners have neither exclusive control over their neighbors'

-12-

property, nor the exclusive ability to safeguard against harm to their neighbors' property caused by the criminal conduct of third parties. To impose such an onerous burden on a property owner would be unreasonable, and would essentially require a property owner to erect an impenetrable barrier to prevent trespassers from committing criminal acts on its property that may cause harm to its neighbors. As the Texas Supreme Court has observed:

> Whether it be a farmer's field, an industrial park, or a twenty-four-hour laundromat, placing a duty on landowners to prevent criminal acts on their property simply because criminals could gain access to their land would make landowners the insurers of crime victims, regardless of the lack of connection between the landowner and either the victim or the perpetrator.

*Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 658 (Tex. 1999).

In conclusion, we hold that it was not reasonably foreseeable that the adjoining owners' buildings would be destroyed by a fire intentionally set by a trespasser in Weinberg's building. Consequently, Weinberg was under no duty to protect the adjoining owners from the criminal act of a trespasser that occurred on her property.

### IV. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. Costs of this appeal are taxed to the Appellants, Main Street Market, LLC, and its surety, and Gilbert and Rebecca Callaway, and their surety, for all of which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

-13-